# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

|  |  |
|---|---|
| SCOTT WADE APPLEGATE | No. 04-20862 |
| Debtor. | Chapter 7 |

FRED C. WHITE,

    Plaintiff,

vs.                                       Adv. Pro. No. 04-2035

SCOTT WADE APPLEGATE,

    Defendant,

     -and-

SHERWOOD METAL PRODUCTS, INC.,

    Plaintiff,

vs.                                       Adv. Pro. No. 04-2036

SCOTT WADE APPLEGATE,

    Defendant.

.

## M E M O R A N D U M

APPEARANCES:

| | | |
|---|---|---|
| F. SCOTT MILLIGAN, ESQ. | G. P. GABY, ESQ. | ARTHUR M. FOWLER |
| LITTLE & MILLIGAN, P.L.L.C. | MILLIGAN & COLEMAN | FOWLER & FOWLER |
| Suite 130, 900 East Hill Avenue | Post Office Box 1060 | 130 E. Market Street |
| Knoxville, TN 37915 | Greeneville, TN 38744 | Johnson City, TN 37604 |
| *Attorney for Scott Wade Applegate* | *Attorney for Fred C. White* | *Attorney for Sherwood* |
| | | *Metal Products, Inc.* |

**MARCIA PHILLIPS PARSONS**
**UNITED STATES BANKRUPTCY JUDGE**

In each of these two adversary proceedings which were consolidated for trial, the plaintiff seeks a denial of the debtor's discharge.   Plaintiff Fred C. White ("White") also seeks a determination that his state court judgment against the debtor is nondischargeable.   A common nucleus in each proceeding is certain income tax refunds exceeding $1 million received by the debtor in 2002.  Plaintiff Sherwood Metals Products, Inc. ("Sherwood") alleges that the debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A) because the debtor concealed or transferred the tax refunds within one year of his bankruptcy filing with the intent to hinder, delay or defraud Sherwood.  Both Sherwood and White contend that the debtor concealed or failed to keep records from which creditors could ascertain the disposition of the tax refunds, a basis for denial of discharge under 11 U.S.C. § 727(a)(3), and that the debtor has failed to satisfactorily explain the disposition of the tax refunds, a ground for discharge denial under 11 U.S.C. § 727(a)(5).   White also raises § 727(a)(3) and (5) with respect to the proceeds from the debtor's sale of his interest in a company called Capital Plus Equity, LLC for $190,000.

As to his nondischargeability complaint,  White alleges that the debtor's obligation to him is nondischargeable under 11 U.S.C. § 523(a)(2)(A) because the debtor obtained from him a short-term, bridge loan by falsely representing he had a commitment for permanent financing and by fraudulently misrepresenting his marital status.    White also asserts that his judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(B) in that the debtor gave him a false financial statement, which failed to reference the debtor's divorce and almost $600,000 in obligations to his ex-wife.

The debtor disputes the plaintiffs' allegations.  He asserts that his disposition of the tax refunds took place well before the one-year period prior to his bankruptcy filing and contends that he has provided adequate records and a satisfactory explanation of the disposition of his tax refunds and of the proceeds he received from the sale of his interest in Capital Plus Equity, LLC.  The debtor also denies that his dealings with White were tainted by fraud.  While he admits that the financial statement he provided to White failed to reference his divorce obligations, he contends that the error was unintentional, immaterial, and without any intent to deceive.

The debtor disputes the plaintiffs' allegations.  Trial in these proceedings was held on October 5 and 6, 2005.  Testifying were the debtor,

2

White, Alan Dietel, a former employee of one of the debtor's companies, Ted Markham, and Jani Trupovnieks. Tendered into evidence were previous depositions of the debtor, his wife Toni Applegate and his mother-in-law, Vicki Pinkston. For the reasons discussed below, the court concludes that the debtor's discharge should be denied pursuant to § 727(a)(2)(A) and (a)(3). Although superfluous, the court also concludes that the debtor's obligation to White is nondischargeable under § 523(a)(2)(A). The following represents this court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. These are core proceedings. *See* 28 U.S.C. § 157 (b)(2)(I) and (J).

I.

 Scott Wade Applegate. The debtor Scott Wade Applegate filed for bankruptcy relief under chapter 7 on March 9, 2004. His schedules filed concurrently with his petition disclosed liabilities in excess of $18 million, with less than $56,000 in assets. Only a few years previously, however, the debtor's financial condition was quite different. His December 31, 1999 financial statement indicated a net worth of over $11 million, based on assets of almost $15 million and liabilities of less than $4 million.

The debtor, who appears to be in his mid 40's, testified that he has a background in finance, equipment leasing, and merger and acquisition. He first came to Greeneville, Tennessee in late 1997 when he purchased Pinnacle Printing from Phillips Electronics, the first of several companies purchased or started by the debtor after his arrival in East Tennessee. In September 1998, the debtor purchased the assets of Doehler-Jarvis, which was in a pending bankruptcy case, and with the assets formed Tennessee Aluminum Casting, LLC ("TAC"), a company that produced aluminum parts for the automotive industry. Around this same time, the debtor also formed Harrison Holdings, LLC ("Harrison Holdings"), which was primarily a vehicle to own the real estate on which TAC operated.

In 1998 and 1999, TAC was successful and operated profitably. According to the debtor's December 31, 1999 financial statement, TAC and Harrison Holdings constituted the bulk of his wealth, with his interest in TAC being listed at $9 million and Harrison Holdings at $2,151,150. At some point, the debtor and his wife Toni purchased a farm in Greene County, Tennessee and built a home worth in excess of a million dollars. In late 1999, Harrison Holdings purchased a King Air

3

plane for the debtor's use at a cost of over $1 million.  By 2001, however, TAC's business began declining, caused in part by the downturn in the economy resulting from the 9/11 terrorist attacks. TAC and Harrison Holdings filed for bankruptcy relief under chapter 11 in January 2002 and converted to chapter 7 within a few months.  Eventually the plane, house, and farm were all foreclosed upon, with the debtor himself succumbing to personal bankruptcy in early 2004.

Integral to the allegations in these proceedings was the debtor's relationship with his wife Toni.  They married in 1995 and had two children, but divorced in October 1999.  The debtor testified that the marriage was strained, caused in part by his wife's alcoholism and binge drinking. According to the debtor, the last straw was when his wife was involved in a serious automobile accident while visiting friends in West Palm Beach, Florida.  The accident was caused by Toni, who after a night of drinking, drove her automobile southward in the northbound lane of I-95 and hit another vehicle head on, causing serious injury to the occupant.  By September 1999, both civil and criminal proceedings had commenced and although there was insurance coverage for the civil action, Toni served some jail time.

In October 1999, the debtor commenced divorce proceedings against his wife in Blount County, Tennessee alleging statutory grounds of marital misconduct.  The debtor testified that he filed in Blount County rather than in Greene County where he resided because of privacy concerns and because Blount County permitted a shorter waiting period.   Eight days after the filing of the divorce complaint, the court entered a final judgment of divorce.   The Marital Dissolution Agreement ("MDA") accompanying the divorce decree provided that the debtor was awarded the parties' 185 acre Greene County farm and all of his interests, free from any claim by Toni, in the following businesses: TAC; Harrison Holdings; JSA & Associates, Inc.; Southeast Machining, LLC; Aluminum Recycling Technology, LLC; Harrison Custom Homes, LLC; Capital Plus Equity, LLC; Pinnacle Printing, LLC; and HMV Aviation Partners.  The MDA obligated the debtor to pay Toni $360,000 as alimony in solido at the rate of $6,000 per month over 60 months and the sum of $21,000 for continuing education, paid over seven years in annual installments of $3,000.  The MDA specified that the debtor would build Toni a house at a cost of up to $200,000, at a mutually agreeable site on the Greene County farm.  Toni was not represented by an attorney in the divorce proceedings but her signature is on the MDA, on a stipulation that grounds for divorce exist, and on

4

an answer agreeing to the divorce.[1]

Notwithstanding the divorce, the couple continued to live together as husband and wife, conceived a third child, who was born on September 19, 2000, and eventually remarried in March 2004, after the debtor's bankruptcy filing. Toni stated in her deposition that when the divorce papers were signed, she left for only two days, staying with her parents who lived in a separate residence on the Applegate farm.  Only a few people were told about the divorce.  Toni stated that she told her family, pastor, and her old business partner;  the debtor testified that he told a couple of people but that he generally kept it secret because he did not want to air his laundry in public.  Alan Dietel, who was hired by the debtor in February 2000 as chief financial officer for JAG Holding, LLC ("JAG"), a holding company for several of the debtor's companies, testified that he did not know about the divorce at the time he came to work for the debtor, that the debtor referred to Toni as his wife on multiple occasions, and that he was totally surprised when he eventually learned of their divorce.

 Fred White.  Plaintiff Fred White is a resident of Columbia, Tennessee, 63 years of age, and a widower with grown children.  Educated as an accountant, White and a partner formed and operated Smelter Services Corporation, a secondary aluminum recycling business that purchased scrap aluminum, melted it, and resold it in the form of ingots.

White and the debtor first met in January 1999 at an aluminum convention in Orlando, Florida.  They were introduced by two long-time, personal friends of White's, Tom Massey and Donald Johnson, both of whom were working for the debtor at the time and according to White, held him in high esteem.  At this initial meeting, the debtor and White talked a great deal due to their common interests.  White testified that the debtor had ambitious ideas and lots of concepts.  The two exchanged phone numbers and kept in touch over the next year.

---

[1] The MDA also provided that the couple would have joint legal custody of the children with the debtor being the primary residential custodian.  With respect to "Co-parenting Time," the MDA stated Toni would have the children in her physical custody Monday thru Friday of each week from 7:00 a.m. until 7:00 p.m. and that "Husband will cause Wife to become the 'employee' of one of the companies in which he has an interest and she shall be paid the sum of Two Thousand ($2,000.00) Dollars per month by that company for so long as she is employed in this capacity."

By the Spring of 2000, the two had increased contact.  White had sold his interest in Smelter to his partner the previous fall and a series of visits thereafter had began taking place between White and the debtor and/or his associates about the possibility of White investing in or becoming involved in one of the debtor's companies, such as JAG or Aluminum Recycling Technology, LLC ("ART"), a business the debtor was developing to recycle scrap aluminum, similar to White's old company Smelter.  White's involvement with the debtor was hampered by a non-compete agreement he had with his former partner and he wanted to ensure that his participation did not violate that agreement.

The parties' discussions advanced to the point that in April 2000, White asked the debtor about his personal financial condition.  The debtor responded by sending White a copy of his December 31, 1999 financial statement. White had his accountant go over the statement and found it impressive; it indicated that TAC was doing a lot of volume and had enough credit lines to operate even if there was a downturn in business.  The financial statement did not reference the debtor's financial obligations to Toni arising out of their divorce.

White testified that on one of his trips to Greeneville in the summer of 2000, the debtor invited him to his home to meet his wife and children on his way out of town.  White stated that the debtor introduced Toni as his wife; the couple appeared to be happily married, and he and Toni discussed the house that the couple were just completing.   The debtor did not dispute the visit by White to his home but stated that he did not believe he had introduced Toni as his wife, although he admitted that he did not know for sure.

During this period of time, the debtor was attempting to obtain funding for ART, which was still in the development stage although land had been purchased.  It was anticipated that $8.1 million was needed to build the facility, purchase the equipment, and support start-up operations.  Alan Dietel, whose first assignment for JAG was to assist in locating funding for ART, testified that after industrial revenue bonds fell through as a source of financing, the debtor commissioned the services of Roger Gribble and his company, Traditional Enterprises, a financial brokerage firm that had assisted the debtor with procuring financing in the past.  Gribble suggested and began pursuing a Rural Development Administration ("RDA") loan, a federally guaranteed loan similar to SBA loans. To obtain an RDA loan, it was necessary to identify the banks which dealt in these types of

6

transactions, obtain a bank's commitment for the loan, and then submit the proposal to the appropriate federal agency for approval, a process which generally took 90 days once the bank's commitment had been obtained.

Gribble made contact with Imperial Bank in North Carolina and then Web Bank, which requested a feasibility study of the ART project by an expert in the field. White was asked to prepare such a study and did so. Both the debtor and Dietel testified that Gribble had advised them that as soon as the feasibility study was completed, the bank would approve the loan, subject to RDA loan approval by the federal government. White similarly testified that the debtor had informed him that the bank would approve the loan as soon as the feasibility study was completed but that no one had advised him that the loan was a RDA loan or that the bank's approval would be conditional. White stated that he had never heard of RDA loans and that in his experience, once a bank gave its approval for a loan, that approval was final since borrowers would act in reliance on a bank's commitment.

White testified that shortly before he completed the feasibility study, the debtor approached him about making a bridge loan of $1.5 million for the initial start-up costs of ART, pending receipt of the permanent financing. The debtor indicated that Mike Gill and Doug Johnson were busy designing equipment for ART and they wanted seed money to get started on the project. According to White, he informed the debtor that he would make the loan if three conditions were satisfied: a firm commitment for a permanent loan was in place, the debtor personally guaranteed the loan, and the loan was secured by a percentage of the debtor's interest in TAC.

On Thursday, June 8, 2000, while he was in Greeneville, White completed the feasibility study and gave it to the debtor. On Monday, June 12, 2000, after White had returned to Columbia, the debtor faxed to White loan documents evidencing a loan of $1.5 million by White to Harrison Holdings for the benefit of ART, guaranteed by the debtor. White testified that the debtor advised him in a phone conversation on June 12 or 13 that he now had a firm commitment from the bank for permanent financing and that based on this representation, White wired the debtor $1.5 million on June 14, 2000. White testified that the debtor did not inform him and he had no knowledge that the permanent financing from the bank was still subject to governmental approval.

7

The documents evidencing the loan from White provided for repayment of the $1.5 million in 90 days. They made no reference to a RDA loan, nor did the documents provide for any contingencies or extensions in the event the RDA loan proceeds were not forthcoming, although the debtor testified that a 90-day term was chosen because this was the typical time to obtain the federal government's approval for a RDA loan. White testified that the 90-day term was chosen because the debtor wanted to give himself plenty of flexibility in repaying the loan, but that the debtor had indicated that he would not even need the full 90 days for repayment and that it would be a waste of time for White to file the UCC-1 financing statement to perfect his security interest. White testified that the debtor understood that he had made the loan with money that he had set aside to pay taxes on his previous sale of his interest in Smelter, payment of which was due on October 15, 2000.

The debtor denied that White had told him that permanent financing must be in place before he would make a bridge loan. The debtor also denied that he told White that the bank had committed to making the loan, although he admitted advising White, based on representations to him by Gribble, that the feasibility study was the last step, the "last piece of the puzzle" in obtaining the bank's commitment. Both the debtor and Dietel were confident that White had been involved in discussions about the fact that the bank's loan would be a RDA loan and that even after the bank agreed to the loan, the agreement would still be subject to federal approval.

Notwithstanding the dispute as to whether White knew the bank loan would be conditional, it is undisputed that at the time White made the bridge loan for ART, no bank had agreed to make a RDA loan. In fact, no commitment was obtained until almost two months later, when on August 3, 2000, Web Bank agreed to make the loan once the requisite governmental approval was obtained. Furthermore, it was unclear if the federal government ever approved the loan. According to Dietel, the ART project became a "nightmare" when it was subsequently learned that the proposed site for ART had historical significance: Indian pottery had been found there and the property contained a civil war cemetery that was the final resting place of pro-Union bridge burners that had been captured and hanged by the Confederate authorities. As a result, the debtor was unable to move forward with the ART project and the loan owed to White went into default. White was repaid some of loan, but when full payment was not forthcoming, sued the debtor and Harrison Holdings in state

8

court in December 2001, subsequently obtaining a judgment for $716,138.64 on September 24, 2003.

Sherwood Metal Products. On October 3, 2001, ART borrowed $1.5 million from Sherwood Metal Products, with the loan being guaranteed by the debtor individually. Although the events leading up to this loan were not addressed at trial, it appears that the parties were still confident at the time that the ART project would go forward since the promissory note for the loan provided that it would be repaid on the earlier of January 2, 2002, or the receipt by ART of loan proceeds from Web Bank, pursuant to the August 3, 2000 commitment. When the ART project folded, Sherwood filed suit against the debtor in state court on April 11, 2002, subsequently obtaining a judgment in the amount of $1,668,246.29 on September 9, 2002. On November 26, 2002, the state court in that lawsuit issued a temporary restraining order prohibiting the debtor from "cashing, negotiating, spending or diverting funds paid to [the debtor] from the Internal Revenue Service pending further order of the Court." A month later by agreed order entered December 23, 2002, the TRO was turned into an injunction, which not only prohibited the debtor from spending funds received by him from the IRS but also ordered him to pay these funds into the registry of the court to satisfy Sherwood's judgment.

The Tax Refunds. The debtor's personal federal income tax returns for 1998 and 1999 indicated substantial income due to the profits generated by TAC and the debtor's other businesses. After TAC's demise, the debtor amended his 1998 and 1999 federal income tax returns to carryback the net operating losses generated by TAC in 2000, thereby creating significant tax refunds. The amended 1998 return resulted in a tax refund of $722,759.76; the amended 1999 return produced a refund of $410,662.

The debtor received the 1999 income tax refund of $410,662 first, on March 21, 2002. This refund was payable to the debtor solely, as the 1999 amended tax return which resulted in this refund was the debtor's individual return due to his and Toni's divorce in October 1999. Immediately upon receipt of the refund, the debtor deposited the check in a joint bank account with Ted Markham ("Markham") in First Community Bank in Rogersville, Tennessee. The debtor had borrowed $100,000 a month earlier from T.J. Box Construction Co. ("T.J. Box"), a corporation owned by

Markham, in order to pay a line of credit called by Greene County Bank, which had a lien on the debtor's residence.  To secure the $100,000 loan, the debtor had granted T.J. Box a security interest in his anticipated tax refunds.  The security agreement evidencing the transaction indicated that the tax refunds secured not only the $100,000 loan but also a "$250,000 contract obligation regarding the purchase of [T.J. Box]."  According to the debtor, Toni's mother, Vicki Pinkston ("Pinkston"), was buying the construction company and the debtor was lending her $250,000 for the down payment.

The day after the debtor's deposit of the tax refund check, three cashiers checks were written out of the bank account, one to Markham for $104,984 in repayment of the earlier loan, a second to Pinkston for $250,000 and the balance of $55,678 to the debtor.[2]  That same day, Pinkston opened a personal checking account at the same bank into which she deposited the $250,000 check and wrote a $250,000 check to Markham, closing the account a month later.

The purposed purchase of T.J. Box fell through, and on June 12, 2002, Pinkston was refunded $202,845.05 of the $250,000, via cashiers check that contained the following notation: "Settlement complete, Payment in full of the deposit."  Pinkston sued T.J. Box and Markham for the balance of the money, and reluctant to negotiate the cashiers check due to the settlement notation thereon, utilized the check as collateral for a $100,000 line of credit loan from Andrew Johnson Bank on June 21, 2002.  That same day, $20,250.00 from this line of credit was transferred to the bank account of Capital Plus Financial, LLC ("CPF"), with sums totaling another $45,000 being transferred to CPF in two transactions within the next month.  On August 19, 2002, $30,000 from the line of credit account was transferred to One Source Industries, LLC, ("One Source").[3]

---

[2] Notwithstanding that the debtor and Markham were the two required signatories on any checks written on the account, the checks were actually signed by Markham and Pinkston.

[3] During the discovery phase of these adversary proceedings, the debtor prepared a list, introduced at trial as Exhibit 52, describing in detail the disposition of the $100,000 line of credit as well as the remainder of the 1999 income tax refund, referred to by the parties in this action as the T.J. Box Refund.  Exhibit 52 indicates that $30,000 from the line of credit was transferred from Pinkston to One Source on August 19, 2002, while another summary prepared by the debtor of One Source's receipts and disbursements in 2002 and 2003, Exhibit 18,  lists receipt of the $30,000 on

(continued...)

On March 3, 2003, Pinkston and Markham agreed in their lawsuit that the June 12, 2002 cashier's check could be negotiated.  Accordingly, Pinkston deposited the check in the Andrew Johnson Bank account where she had obtained the $100,000 line of credit, paid off the line of credit note, and transferred the $103,080 balance of the account to One Source.

As set forth more fully below, both CPF and One Source were companies associated with the debtor.  Notwithstanding the numerous transfers to these companies, the debtor testified that every dollar of the 1999 tax refund paid out was used to pay debt that Pinkston owed to him or that he owed to someone else.

With regard to the amended 1998 return, the debtor received a tax refund of $722,759.76 on July 12, 2002.  Unlike the 1999 tax refund that was derived from the debtor's individual tax return, the 1998 refund arose out of the debtor and his wife's joint filing.  Both the original and the amended 1998 returns were joint, although the amended '98 return indicated that the parties had since divorced.  According to a statement filed with the return:

> Scott Applegate incurred a net operating loss in 2000 while filing a tax return as single (he divorced his wife Toni in 1999).  The 2000 net operating loss has been carried back to 1998.  In 1998, Scott filed a joint tax return with his ex-wife (Toni).  Pursuant to Revenue Rulings 86-57, 60-216 & 80-6, Scott has recalculated the 1998 taxable income based on married separate for he and his ex-wife (see attached).  His ex-wife would have no taxable income based on her income and expenses in 1998.  Accordingly, all of the 1998 taxable income and taxes is attributable to Scott.

Immediately upon the debtor's receipt of the income tax refund, he flew in his company plane

---

[3](...continued)
August 22, 2003, from CPF.  At trial, the debtor testified that the monies went first into CPF and then One Source, but was not able to explain why the monies took this route.

Exhibit 52 's list of transfers from the $100,000 line of credit to CPF is inconsistent with CPF's bank statements.  According to the Exhibit 52, $20,250 was transferred to CPF on June 21, 2002, $30,000 on July 3, 2002 and $15,000 on July 12, 2002.  CPF bank records show a deposit of $20,000 on June 24, 2002, and a deposit of $30,000 on July 5, 2002.  No $15,000 deposit is shown, but there is a deposit of $9,829.75 on July 15, 2002.  The debtor gave no explanation for these inconsistencies, other than to state that the summaries had been prepared as "summaries" and therefore did not necessarily reflect every transaction.

to Atlanta, Georgia where he opened and deposited the check in a Morgan Stanley account in the name of Toni Applegate, Account No. 769-035390. The debtor testified that he placed all of the monies in Toni's name because the money was part hers due to the joint return and in order to satisfy his financial obligations to her arising out of their marital dissolution agreement. He also testified that he assisted Toni in setting up the account and in managing the money because she did not have the sophistication to handle such a large sum.

Within a month after the debtor opened the Morgan Stanley account, sums totaling $240,000 were wired in two transactions from the account to Toni's checking account at Greene County Bank, from which a check in the amount of $121,692.82 was written to One Source. On August 29, 2002, $50,000 was wired from the Morgan Stanley account directly to One Source's bank account. On September 30, 2002, $57,013.07 was wired from the Morgan Stanley account to Greene County Bank for payment on the debtor's and Toni's $855,000 debt on their residence. From October 15, 2002 through July 7, 2003, additional sums totaling $225,000 were transferred from the Morgan Stanley account to One Source.[4] Other transfers from the Morgan Stanley account included $5,000 on April 21, 2003, and $12,000 on June 3, 2003, to the debtor's and Toni's joint account at Greene County Bank and $6,000 on August 6, 2003, and $3,100 on August 19, 2003, directly to the debtor. There was also a transfer of $5,050 on July 18, 2003, from the Morgan Stanley account to National Bank of Tennessee. The debtor was indebted to this bank for a personal line of credit and on a debt secured by his personal residence.

The evidence in this case indicated that these were actually two Morgan Stanley accounts in Toni Applegate's name, the second having been opened by the debtor on October 29, 2002. According to the debtor, the original Morgan Stanley account was a money market account, while the new account was an investment account that would produce higher yields, and monies were moved back and forth between the two accounts. The majority of the transfers to One Source, etc., cited previously were from the original Morgan Stanley account, although a few were from the

---

[4] The $225,000 total consisted of the following wire transfers: $70,000 on October 29, 2002; $40,000 on December 2, 2002; $50,000 on January 28, 2003; $25,000 on February 14, 2003; $8,000 on April 2, 2003; $27,000 on April 4, 2003; and $5,000 on July 7, 2003.

second account.

During the discovery phase of these adversary proceedings, Sherwood issued subpoenas pursuant to Federal Rule Civil Procedure 30(b)(6), directing the following entities to designate a witness to appear on their behalf at a deposition on June 22, 2003: One Source; CPF; Capital Plus Equity, LLC; AMP Holdings, LLC; JAG; Harrison Holdings; and Pinnacle Printing, LLC. The debtor appeared as the designated witness on behalf of each of the entities.

Capital Plus Equity. Capital Plus Equity, LLC ("CPE") was a financing company the debtor established before he moved to Tennessee. He testified that after he set up TAC, he did not have time for CPE anymore and that it was basically a portfolio that was running out. CPE was referenced in the debtor's and Toni's October 1999 Martial Dissolution Agreement as one of the companies awarded to him free and clear of any interest of his wife. Consistent with the MDA, the debtor's personal December 31, 1999 financial statement listed an interest in CPE valued at $135,000. Sometime in July 2002, the debtor prepared a joint financial statement for Scott and Toni Applegate dated as of July 31, 2002. This statement listed CPE with a net value of $325,000, although the debtor testified at trial that CPE was included in this financial statement because it was an asset of Toni's rather than his.

Notwithstanding the foregoing, the debtor also testified that in January 2002 he sold his interest in CPE to CPF for $200,000, receiving a promissory note in this amount, and that subsequently, in December 2002 in payment of this note, CPF assigned to the debtor its right to receive distribution from CPE, from which the debtor received $190,000 on December 12, 2002. The debtor deposited this money into Toni's Greene County Bank checking account and his name was added to the account. Within six weeks of the deposit, sums in excess of $120,000 were transferred to One Source. According to the debtor, $70,830 of the monies transferred to One Source were capital investments by Toni and the remainder constituted loans from Toni, although there was no evidence that One Source executed promissory notes evidencing the loans. Two of the checks which were purportedly capital contributions from Toni were actually written by the debtor, a check for $13,000 on January 2, 2003, and a $7,830 check on January 16, 2003.

Capital Plus Financial, LLC. The debtor's personal December 31, 1999 financial statement

13

listed a 44.5% interest in Capital Plus Financial Group, Ltd. valued at $9,000. No reference is made to this entity in the debtor and Toni's MDA and it was not clear from the evidence whether this entity was the predecessor to CPF, an entity formed on April 5, 2000, according to records from the Tennessee Secretary of State. The couple's July 31, 2002 financial statement listed CPF with a value of $25,000, and as with respect to CPE, the debtor testified at trial that the asset was included in the statement because it belonged to Toni, rather than to him. An exhibit to CPF's Operating Agreement dated as of January 1, 2002, indicated that Toni owned 89% of the company, Inez Brittain (the debtor's mother) owned 8%, and Pinkston (Toni's mother) owned 3%. Yet the annual report for the entity dated March 6, 2002, and signed by the debtor as Chief Manager, listed the members as the debtor and Pinkston. In his January 31, 2003 deposition, the debtor testified that the members of CPF were Fred McDonald and Toni, yet in his November 19, 2003 deposition, the debtor stated that CPF was owned by Brittain, Toni and Pinkston, who respectively held 51%, 29%, and 20% interests. In his June 22, 2005 deposition, the debtor reiterated that the original members had been the foregoing three women, but stated that Toni was currently the only member although he could not recall when this change took place. Similarly at trial the debtor testified that Toni was the owner of CPF. The debtor denied in his June 22, 2005 deposition that he had ever been a manager of or employed by CPF but indicated that he had done work for the company. A July 9, 2004 CPF lease agreement introduced at trial was signed by the debtor as vice president of CPF.

One Source Industries, LLC. According to the debtor, One Source was a successor to Southeast Machining LLC ("Southeast"), an entity set up to be a minority owned company to machine the finished product produced by TAC but one which never really got off the ground. The debtor and Toni's MDA awarded him all of his interest in Southeast, and a listing of JAG's companies forwarded to White on June 26, 2000, included an interest in Southeast. On December 29, 2000, Southeast merged with Advent Energy Services LLC ("Advent"), with Advent being the surviving entity. Advent's annual report filed May 6, 2002, listed the debtor and Pinkston as the only members, with Advent's name being changed to One Source Industries, LLC a short time later. One Source was administratively dissolved on September 19, 2003.

At the June 22, 2005 deposition, the debtor testified that One Source never really operated as a company and never had revenues from operations, although it had looked for machining

companies to purchase and operate.  He also testified that other than One Source's bank statements and a summary of One Source's receipts and disbursements from January 1, 2002 through December 31, 2003, prepared by him in connection with these adversary proceedings (Exhibit 18), One Source had no financial records for the two years that it was in existence.  On the other hand, he also indicated that  Pinkston kept the records and wrote checks for One Source and that she was the company's only employee.

With regard to ownership of One Source, the debtor and Toni's July 31, 2002 financial statement listed One Source as one of the companies owned with a net value of $125,000.  As in the case of CPE and CPF, the debtor explained at trial that One Source was listed in the financial statement because it belonged to Toni.   Pinkston testified in her October 31, 2003 deposition that Fred McDonald owned 51% of One Source and Capital Plus owned 49%, testimony supported by the CPF's 2002 income tax return which indicated that it acquired an ownership interest in One Source in 2002, and consistent with the debtor's March 28, 2005 deposition where he stated that at one time Fred McDonald held a 51% interest in One Source.   However, in Pinkston's March 20, 2005 deposition, she testified that she thought she owned 20% of One Source, that Toni owned 20%, and that the remainder was owned by Fred McDonald.  Later in the same deposition when asked about One Source's ongoing monthly payment of $370 to debtor's mother, Inez Brittain, Pinkston stated that she thought Brittain had an ownership interest in One Source and recalled that on occasion Brittain came to the office to help out.  The debtor denied that he had ever been a member or employee of One Source but stated that he had tried to put deals together for it.  Admitted into evidence was a March 5, 2003 promissory note of One Source in favor of Nashville Jet Center in the amount of $23,995.98 signed by the debtor as president and notarized by Pinkston.

One Source was the recipient of the majority of the tax refund monies and the majority of the proceeds from the sale of the debtor's interest in CPE.  As previously noted, $120,000 of the $190,000 received by the debtor from the sale of his interest in CPE was transferred from his checking account at Greene County Bank to One Source's account.  The debtor gave no explanation as to why his money was transferred to a company in which he testified that he had no ownership interest.  Of the $202,845 refunded to Pinkston from Markham, which were the proceeds of the 1998 tax refund, sums totaling $133,080 were distributed by Pinkston to One Source.  The debtor's

15

explanation for these transfers was that One Source had paid some of his bills although no details of such payments or documents supporting such payments were offered. Lastly, of the 1999 income tax refund that the debtor invested at Morgan Stanley in Toni's name, almost $350,000 was ultimately transferred to One Source.

The debtor admitted that One Source used a significant portion of these monies to pay his personal debts. The summary of One Source's receipts and disbursements prepared by the debtor reveals that from August 2002 through April 2003, One Source paid the $9,421.96 monthly payment to Carter County Bank on the King Air plane note, a Harrison Holding debt for which One Source had no liability, but one that the debtor had personally guaranteed. One Source also on numerous occasions paid the monthly insurance premium on the plane, hangar expense, maintenance and airport fees. According to the debtor, One Source paid these bills because he was using the plane on One Source's behalf in an attempt to arrange deals for the company. On March 10, 2003, One Source paid $6,265.50 in legal fees to the debtor's personal attorney; it also paid on mutual debts owed personally by the debtor and Toni to Greene County Bank. From July 18, 2002 through December 31, 2003, One Source transferred over $100,000 to AMP Holding, LLC, another company associated with the debtor; sums totaling almost $100,000 to Toni; and approximately $25,000 to CPF. Transfers directly to the debtor from One Source include $10,000 on March 6, 2003, $1,700 on March 17, 2003, and $1,000 on May 21, 2003.

AMP Holding, LLC. AMP Holding, LLC ("AMP"), an acronym for Applegate, McDonald and Pinkston, was formed in June 2002 and administratively dissolved in September 2003. Toni held a 60% interest in the company, Fred McDonald 20% and Pinkston 20%. According to the debtor's June 22, 2005 deposition testimony, AMP "was set up as a real estate holding company for anything that we might – any real estate deals that we might buy." Nonetheless, it never owned any real estate or leases and never generated any income except for management fees paid by One Source[5] and CPF.[6]

---

[5] No details such as amount and timing were given regarding the management fees paid by One Source to AMP. From the summary of AMP's receipts and disbursements prepared by the debtor, it appears that these amounts were paid sporadically and in differing amounts. The first management fee received by AMP from One Source was on November 11, 2002, in the amount of
(continued...)

AMP's summary of receipts and disbursements prepared by the debtor indicated that from August 9, 2002, through June 13, 2003, One Source made ten loans to AMP, totaling $62,153.  With limited exceptions, it appears AMP's monies were used to pay Pinkston's salary, consisting of semi-monthly or bi-weekly payments of $2,291.66, and insurance for Pinkston, the debtor, Toni, and their families.

Vicki Pinkston.  In her March 30, 2005 deposition, Pinkston testified that she performed clerical work for Harrison Holdings and TAC until after its bankruptcy, and that in 2002, the debtor hired her as office manager for CPF.  She testified that the debtor subsequently hired her as office manager for AMP and then for One Source, and that she was unclear as to when employment for one ended and the next began since "they were all Scott's entities" and all positions were at the same office location.  Pinkston testified that she had nothing to do with the establishment of CPF, that she did not recall asking to become a member, and that the company was set up by the debtor, who made her a member.  She testified that she wrote the checks for CPF, based on instructions from Toni or Scott, and that she "did not make any decisions on where the money went or where the money was spent."

Toni Applegate.  From a review of Toni Applegate's December 30, 2003, and March 30, 2005 depositions, it was clear that she had little involvement or knowledge in the various businesses run by the debtor.  When asked in her 2003 deposition her understanding of how the business of TAC was doing prior to September 11, 2001, Toni responded: "I honestly don't know.  I'm just – they don't talk to me about that kind of thing, my mom or Scott, or finances or anything."  Toni acknowledged that she was familiar with a company called Capital Plus, stating that she believed that it was a finance company started by the debtor years ago, but she had no knowledge as to whether

---

[5](...continued)
$6,000.  Another was paid on December 4, 2002, in the amount of $1,700 and a third a week later on December 12, 2002, for $2,800.  The next was January 21, 2003, for $6,100; then $3,000 on January 31, 2003; $3,000 on February 3, 2003; $2,000 on February 14, 2003; $2,300 on February 27, 2003; $8,800 on March 28, 2002; $2,100 on April 15, 2003; $3,000 on May 14, 2003; and $1,000 on May 19, 2003.

[6] According to the debtor's summary of AMP's receipts, CPF only paid management fees on two occasions, $5,700 on April 28, 2003, and $1,800 on September 5, 2003.

he had sold his interest in the entity.    Toni did know that a federal income tax refund had been received at some point, but had "absolutely no idea" as to the amount.    When asked in her 2003 deposition if the amount were closer to $100 or closer to a million dollars, she responded: "I don't know.  I never dealt with – I mean, I just don't.  That's not my part of the whole equation."

Q. "So what, does Scott take care of that?

A. "That and my mom and, yeah, I mean, I'm not a – it just wasn't my part.

Q. "I don't mean to put words in your mouth, but are you telling us that if the federal refund of income tax came in, that Scott took care of that and you didn't?

A.  "I don't know.  I don't know what happened to it, so I can't tell you what happened to it.  I really don't even know how much money we're talking about here, so –

. . . .

Q. Do I understand you correctly that you didn't get it?

A. I don't know.  It may have gone into my account, but I don't – I don't know.

. . . .

Q.  All right.  Now, let me get  – if I understand you correctly, you don't really know how much of a tax refund you all got?

A. No, sir.

Q. And you don't know what happened to the money?

A. No, sir, other than paying bills.

Q. Okay.  And the only thing that you had said, and I wrote this down, the only thing you knew about it was you heard them talking about it, is that correct?

A.  I'm not sure if that's how I found out, or I believe I said that I either overheard them – them, mom and Scott were together at the time.

 . . . .

Q. Okay.  The only reason you know anything about it is you heard them talking about it?

A. Either that or Scott told me.  I don't know, I don't recall.  That's why I was saying that one of the two happened.

Q. But that's all you know about the tax refund?

A. Yes, sir, that's all.

 . . . .

18

Q.  It's a fair statement to say that Scott handled the financial affairs?

A.  Yes, it is.

In her March 30, 2005 deposition, Toni showed a little more familiarity with the tax refunds and the businesses associated with her husband.[7]  She testified that she had an ownership interest in CPE, but did not know the extent of that interest or the identity of the other members or whether she was a manager.  She testified that she thought she had an interest in CPF, but again did not know the extent or the identity of other members.  She even raised the possibility that she could have an interest in "all of them," although "I don't know.  I have no idea."  Toni expressed general knowledge of monies in the Morgan Stanley accounts and indicated that monies were wired out of these accounts to pay bills but it did not appear that she either made the decisions as to what bills were to be paid or even physically wrote the checks to pay them or gave the wiring instructions.

Alan Dietel.  Alan Dietel ("Dietel") testified that he moved to Tennessee from St. Louis, Missouri upon being hired by the debtor in early 2000 as CFO of JAG.  Dietel indicated that one of the reasons he accepted the position was because the debtor informed him that industrial revenue bonds had been approved to finance JAG's projects, such as ART, but that when he arrived here, the mechanism of how to finance the bond was more complicated that he had been led to believe.  Dietel also testified that he got the impression from Gribble that the loan would be approved by the bank when the feasibility study was conducted, but offered that his understanding may have pertained to Imperial Bank rather than to Web Bank.

Jani Trupovnieks.  Jani Trupovnieks ("Trupovnieks"), a resident of Knoxville, testifed that in 2002 he operated a business by the name of Trupvonieks and Associates, LLC d/b/a Cagle Waste Handling Equipment, which was experiencing financial difficulties.  His attorney, who also happened to be the debtor's attorney, suggested that he meet the debtor and that he might be able to help him.  In the summer of 2002, Trupovnieks met the debtor at his office in Greeneville where he was operating CPF and the two discussed the possibility of forming a new company, which would assume

---

[7] The court's review of this deposition was hampered by the fact that only portions of the transcript were entered into evidence by the parties.

19

the majority of the debt of Trupovnieks' company.  No action was taken until October 2003 when the debtor and Trupovieks put together a deal whereby Trupovieks' company was restructured: the name of the resulting new company was One Source Industrial LLC and it was owned by CPF, Fred McDonald, Trupovnieks and his wife. Trupovnieks moved the operations of the new business into the debtor's office in Knoxville and stayed there until July or August 2004.  Trupovnieks testified that based on his contact with the debtor, the two businesses the debtor were involved in were One Source and CPF, that the debtor appeared to be in charge of CPF while Pinkston performed clerical duties, that he never saw any activity with One Source, and that the only thing he knew about One Source was that Fred McDonald might be involved with the company.

III.

Sherwood and White each assert that the debtor's discharge should be denied under 11 U.S.C. § 727(3) and (5), with Sherwood also proceeding under 11 U.S.C. § 727(a)(2)(A).  In addition, White seeks a determination of nondischargeability under 11 U.S.C. § 523 (a)(2)(A) and (B).  The plaintiffs have the burden of proof on all issues. Fed. R. Bankr. P. 4005 (discharge); *Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 281 (6th Cir. 1998) (dischargeability). The standard, both with respect to denial of discharge and a determination of nondischargeability, is preponderance of the evidence.  *See Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 683 (6th Cir. 2000) (discharge); *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 660 (1991) (dischargeability). Furthermore, "[t]he Bankruptcy Code should be construed liberally in favor of the debtor." *Id.* (citing *Gillickson v. Brown* (*In re Brown*), 108 F.3d 1290, 1292 (10th Cir. 1997)).

Denial of Discharge under 11 U.S.C. § 727(a)(2)(A).  The first ground raised by either of the plaintiffs is denial of discharge under § 727(a)(2)(A), which provides:

(a) The court shall grant a discharge, unless—

(2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with the custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the

date of the filing of the petition[.]

As construed by the Sixth Circuit Court of Appeals, this provision encompasses two distinct elements:  "(1) a disposition of property, such as concealment, and (2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property.'"  *In re Keeney*, 227 F.3d at 683 (quoting *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997)).  "[B]oth elements (the act of concealment and requisite intent) must occur within a year before the bankruptcy petition is filed."  *Id*. at 684.

With respect to the intent element of § 727(a)(2)(A), actual "intent to hinder, delay or defraud" is required; mere constructive intent is insufficient.  *See Moreno v. Ashworth* (*In re Moreno*), 892 F.2d 417, 419 (5th Cir. 1990).  Nonetheless, "a finding of actual intent may be based on circumstantial evidence or on inferences drawn from a course of conduct."  6 *Collier on Bankruptcy* ¶ 727.02[3][b] (15th ed. rev. 2005); *see also In re Keeney*, 227 F.3d 679 at 684 ("The requisite intent to hinder, delay, or defraud was . . . permissibly inferred by the bankruptcy court . . . .").  Circumstances indicating fraud may include:

> the lack or inadequacy of consideration; the family, friendship or close associate relationship between the parties; the retention of possession, benefit or use of the property in question; the financial condition of the party sought to be charged both before and after the transaction in question; the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties or pendency or threat of suits by creditors; and the general chronology of the events and transactions under inquiry.

6 *Collier on Bankruptcy* ¶ 727.02[3][b] (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F. 2d 1574 (2d Cir. 1983)).

In the present case, the debtor argues that no violation of § 727(a)(2)(A) occurred because he did not transfer the tax refunds within one year of his bankruptcy filing as Sherwood alleges.  He notes that his bankruptcy case was filed on March 9, 2004, that the one year before that date began on March 9, 2003, and that he disbursed the tax refunds in 2002 upon their receipt, months before March 9, 2003.  With respect to the 1999 tax refund of $410,000 received by the debtor in March 2002, the debtor points out that he immediately transferred $100,000 to Markham's company for a

21

loan repayment, loaned $250,000 to Pinkston, and placed the $50,000 remainder in his bank account where it was used to pay personal obligations. He admits that some of the money he loaned Pinkston may have been repaid to him during the year preceding his bankruptcy filing, but denies that these funds were concealed or transferred by him with the intent to defraud the plaintiffs or his other creditors. He asserts that he has fully explained and produced records establishing the disposition of those funds, which he used to pay living expenses and other obligations. As to the $722,759.76 tax refund he received in July 2002, the debtor states that this money was part Toni's and that to the extent it was part his, he immediately turned it over to Toni in partial satisfaction of his MDA obligations and that the transfer by him to Toni was prior to the year before his bankruptcy.

Sherwood admits that the debtor's initial receipt and disbursements of the tax refunds were outside the requisite one-year period. Sherwood, however, relies on the "continuing concealment" doctrine whereby "a transfer made and recorded more than one year prior to filing may serve as evidence of the requisite act of concealment where the debtor retains a secret benefit of ownership in the transferred property within one year prior to filing." *In re Keeney*, 227 F.3d at 684 (quoting *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997), and citing *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993) (describing the doctrine by stating that "a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one-year period as long as the debtor allowed the property to remain concealed into the critical year")). Sherwood argues that the 1998 income tax refund which the debtor placed in the Morgan Stanley account in Toni's name belonged entirely to the debtor and that notwithstanding the purported transfer to Toni, the debtor never relinquished control of the money. Sherwood makes a similar argument with respect to the 1999 tax refund, asserting that it was the debtor rather than Pinkston that was purchasing T.J. Box, and that the debtor's use of the funds were designed to frustrate his creditors. Sherwood maintains that by way of the transfers to his wife, mother-in-law, and his various corporations, the debtor hid his income tax refunds from Sherwood, with the intent to hinder and delay Sherwood's efforts to collect on its judgment against the debtor.

This court concurs with Sherwood and finds that it has established the required elements for a denial of discharge under 11 U.S.C. § 727(a)(2)(A). It is clear that the debtor placed the 1998 tax refund in the amount of $722,759.76 in Toni's name at Morgan Stanley in an attempt to hide the

22

funds from his creditors and that notwithstanding the purported transfer, continued to control and direct the disposition of these monies. *See Caterpillar, Inc. v. Gonzalez* (*In re Gonzalez*), 302 B.R. 745, 752 (Bankr. S.D. Fl. 2003) (A concealment for purposes of § 727(a)(2) may be carried out in one of two ways: a debtor can conceal a transfer by misleading a creditor into thinking that the transfer did not occur, or the debtor can make a sham transfer whereby title to the property is transferred but the benefits of ownership are retained.).

Without question, the 1998 income tax refund belonged entirely to the debtor.  The debtor obtained the refund based on his representation in his amended tax refund made under penalty of perjury that all of the 1998 income and taxes were attributable solely to him and thus, all of the refund was owed to him.  This court will not countenance the debtor's attempt to contradict his previously sworn statement by asserting in this proceeding that the refund belonged partly to Toni. Furthermore, the only evidence for this proposition was the debtor's testimony; it is otherwise unsupported by the facts or by the law.  The amended tax return indicated that Toni had no taxable income in 1998. Therefore, the income tax refund, like the original payment of taxes, was based on income generated by TAC.  According to the debtor's and Toni's marital dissolution agreement, only the debtor had an ownership interest in TAC and this interest was awarded entirely to him in the divorce.  As such, the refund legally belonged to the debtor. *See United States v. MacPhail*, 149 Fed. Appx. 449, 453, 2005 WL 2206681, **3 (Sept. 12, 2005) ("[A] refund should be disbursed in proportion to the amount each spouse paid to the taxes owed.").

The court simply does not find credible the debtor's assertion that he transferred the property to Toni in satisfaction of his MDA obligations.  Even including the debtor's agreement to build Toni a $200,000 home, these obligations only totaled $581,000, not the refund amount of $722,759.76. The MDA had been entered into more than two and one-half years prior to the transfer.  During that time, the debtor and Toni had continued to live together and hold themselves out as husband and wife, even having another child.  The debtor had even prepared a joint July 31, 2002 financial statement in the name of Scott and Toni Applegate as though they were married.  At the time of the debtor's deposit of the monies into the Morgan Stanley account, there was no evidence that Toni had made demand on the debtor for payment of the MDA obligations or that she even considered them still owing.  Moreover, it does not even appear that Toni knew at the time that the debtor had

23

transferred these monies to her.  He flew to Atlanta, set up the Morgan Stanley account in her name, and made the deposit.  Although this transaction took place in July 2002, Toni testified in her December 2003 deposition that she had no idea of the amount of the refund or what happened to it.

Obviously, the debtor seized upon the long-dormant MDA obligation as an excuse to transfer the refund to his wife rather than risk losing the money to his creditors.  Both the Sherwood and White lawsuits were pending against him at the time.  TAC and Harrison Holdings had failed. ART had become a disaster and the other businesses, such as One Source and AMP never got off the ground.  The debtor had no income[8] but did have substantial financial obligations on his home, farm, and plane.  The tax refunds were the only real money available to him to hang on to these assets.[9]

Plainly, the debtor's transfer of the monies to Toni was in name only as he continued to make the primary decisions regarding the money's use.  Contrary to the debtor's assertion, his actions in this regard went far beyond merely assisting or advising Toni as to how the money should be spent. As noted, during this time period Toni did not even know that the Morgan Stanley account existed; she indicated in her deposition that the debtor handled their financial affairs; and both the debtor and Pinkston opined that Toni did not have the financial sophistication to manage the monies.  Moreover, the monies were used not only to pay the debtor's and Toni's mutual debts, but also debts on which he alone was liable.  From all indications, the debtor retained all the benefits of ownership notwithstanding the purported transfer to Toni.  *Cf. Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1583 (2d Cir. 1983) (debtor's transfer of property to his spouse while insolvent, but retaining the use and enjoyment of the property was a classic badge of fraud).

With respect to the 1999 tax refund in the amount of $410,662 received by the debtor on or about March 22, 2002, it does not appear that the debtor's initial disposition of these funds was

---

[8] In his January 2003 deposition, the debtor testified that he had had no income from any source since April 2002.

[9] The debtor not only utilized the anticipated tax refunds to borrow money from Markham in February 2002 but he also put up the refunds as collateral for a loan from National Bank of Tennessee a month later.  Markham testified that the debtor borrowed the $100,000 from him because he needed the money to save his home.

fraudulent.   At the time the debtor received these monies, Sherwood had not yet commenced its collection lawsuit against the debtor.   There was no indication that the debtor's earlier $100,000 loan from Markham and his repayment of the loan with a portion of the tax refund proceeds were not legitimate.   As to the $250,000 loan to Pinkston, although Markham testified that he believed that the debtor would be involved in the purchase of T.J. Box and the debtor even pledged his interest in the tax refund to secure the $250,000 deposit for the purchase, other evidence supported the assertion that Pinkston, not the debtor, was purchasing the company and that the debtor was merely loaning her the money for the purchase.   Both the debtor and Pinkston in her deposition testified that she was the purchaser and Toni indicated in her deposition that her mother was disappointed when the purchase fell through.   The check to Markham was from Pinkston and it was she, not the debtor, who sued when Markham failed to refund the full $250,000 deposit.

Nonetheless, the evidence establishes that when the sale fell through, the debtor began concealing these funds from his creditors.   When Pinkston received the deposit back from Markham, she did not simply repay it to the debtor as one would expect since Pinkston had borrowed the money from the debtor.   Indeed, using the check to obtain a $100,000 line of credit loan, Pinkston transferred the loan proceeds to CPF and One Source in July and August 2002, where they were then used to pay some of the debtor's financial obligations.   Similarly, when the lawsuit between Pinkston and Markham was resolved on March 3, 2003, Pinkston transferred the balance of the monies, some $103,080 to One Source.   The evidence was clear that the debtor directed all of these transfers. Pinkston testified that she made no decisions as to how the monies where spent, that these decisions were made by the debtor or Toni, and as was evident from Toni's depositions, Toni did not direct the transfers.

The debtor's control of the tax refunds continued even after the funds were transferred to One Source, CPF, and AMP, as these entities were controlled by the debtor.   *Cf. In re Kaiser*, 722 F.2d at 1583 (debtor's shifting of assets to a corporation wholly controlled by him was a badge of fraud). The debtor maintained at trial that Toni owned these entities and the summaries prepared by him for One Source and AMP listed transfers from Toni as loans or capital contributions.   However, Toni's ownership was often contradicted not only by the few corporate records produced, but also by the deposition testimonies of Pinkston and often even by the debtor's own deposition testimonies.   Due

25

to these inconsistencies and the paucity of records, this court was simply unable to glean from the evidence the chain of ownership in the various companies.  Regardless, however, of actual ownership, it was clear that the debtor called the shots. Toni left the management decisions to the debtor; Pinkston's role was limited to a clerical one, and she even testified that they "were all Scott's companies."  Furthermore, it was clear from the evidence that One Source and AMP were not actually operating or generating revenues from operations and were primarily used as a means to keep the tax refunds from the reach of the debtor's personal creditors.

Both the debtor's beneficial interest in and control of the tax refund monies and his intent to delay and hinder Sherwood and White from obtaining the tax refunds continued into the year preceding his bankruptcy filing.  As noted, the debtor entered into a consent order with Sherwood on December 23, 2003, agreeing to pay any tax refund monies into the registry of the court.  Thus, it was clear at that point that Sherwood was specifically seeking to obtain the debtor's tax refund monies to apply to its judgment.  Notwithstanding the debtor's agreement with Sherwood, the debtor continued to furtively direct the disposition of the monies to satisfy his other financial obligations all the while misleading Sherwood as to the location of the funds.  In the debtor's deposition taken by Sherwood on January 31, 2003, only six months after he had flown to Atlanta to deposit the larger tax refund, the debtor was asked if the tax refunds were deposited in local banks.  The debtor responded "I would imagine. . . .  I don't remember exactly where it went," a response clearly not credible considering the debtor's financial circumstances and one obviously designed to frustrate Sherwood's collection efforts.  In the same deposition, the debtor also testified that the only bank account on which he had check signing authority was an account at Greeneville Federal Bank.  Yet the evidence established that the debtor had become a signatory on his wife's checking account at Greene County Bank the previous month and that he had even written checks on the account during the month before the deposition, including a check to Greeneville Federal Bank in the amount of $3,750 on December 30, 2002; a check for $13,000 to One Source on January 7, 2003; another check to One Source eight days later for $7,830, a check to MBNA America Bank for $4,000 on January 21, 2003; a check to Greene County Bank for $7,330.67 on January 28, 2003; and two other checks that same day to National Bank of Tennessee for $5,350 and $1,050.  Later in the year, at a deposition taken by White on October 31, 2003, the debtor was again asked if he had any bank accounts with

26

anyone and he again responded "No," even though he continued to be on the same Greene County Bank account with Toni.

Also in the January 31, 2003 deposition, the debtor was asked about his assets and responded that he had no assets other than his home, the land, and the car he was riding in. Despite this testimony, the debtor still had not been repaid all of the $250,000 he loaned Pinkston to purchase T.J. Box. When she settled this lawsuit on March 3, 2003, she immediately transferred the balance of $103,080 to One Source rather than to the debtor, even though he rather than One Source had loaned her the money. It is clear to the court that this action was taken to hide these monies from Sherwood and White so that they would be accessible to pay the debtor's other debts and expenses.

Finally, as previously noted, the evidence was undisputed that within the one year prior to the debtor's bankruptcy filing, tax refund monies were transferred from the Morgan Stanley accounts directly to the debtor or to pay obligations on his behalf and monies were transferred by One Source or AMP directly to the debtor or on his behalf. Given the timing of these transfers in conjunction with the lawsuits against the debtor, the debtor's otherwise lack of funds, the evidence that these transfers were directed by the debtor, the control exerted over the corporate entities by the debtor, and the lack of consideration for the entities' receipts of these monies or for their subsequent disbursements on the debtor's behalf, this court can only conclude that the debtor manipulated the transfers and concealed his interest therein in order to deter and hinder Sherwood and White in their collection efforts.

Denial of Discharge under 11 U.S.C. § 727(a)(3). Another ground for denial of discharge raised by Sherwood and White is § 727(a)(3) of the Bankruptcy Code, which provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

27

According to the objecting plaintiffs, the debtor has falsified, concealed, and failed to keep books and records that would establish his deposition of the tax refunds in question.   More specifically, Sherwood asserts that the debtor has not provided any accounting records evidencing the disposition of the tax refund monies received by CPF; that the debtor failed to disclose the existence of the second Morgan Stanley account; and that the debtor falsified a summary of the first Morgan Stanley account that he prepared for the plaintiffs during the course of these adversary proceedings.   In addition, White asserts that the debtor has failed to produce records evidencing the disposition of the $190,000 he received in December 2002 from the sale of his interest in CPE to CPF.

"The purpose of [§ 727(a)(3)]is to ensure that the trustee and creditors receive sufficient information to trace a debtor's financial history for a reasonable period past to present."   *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990).   To prevail, the creditor need not show intent to defraud, *see e.g.*, *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999), or even intent by the debtor to conceal his or her financial condition, *see e.g.*, *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1297 (9th Cir. 1994).   While the burden of persuasion remains on the plaintiff, see Fed. R. Bankr. P. 4005, once the plaintiff has established a prima facie case, the burden of going forward with the evidence shifts to the debtor, requiring proof that the failure to maintain and preserve adequate records is justified under the circumstances of the case. *See Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 883 (B.A.P. 6th Cir. 1999).

"An objective standard should be applied in determining whether a debtor is justified in failing to preserve financial records, and the court must therefore assess Debtor's conduct with respect to how a reasonable person would have acted under similar circumstances."   *Consumers United Capital Corp. v. Greene (In re Greene)*, 202 B.R. 68, 71-72 (Bankr. D. Md. 1996).   The factors that the courts consider in determining if a debtor has shown such a justification include the debtor's intelligence, education, and sophistication, his or her experience in business matters, the volume and complexity of the debtor's business, the extent of the debtor's involvement in the business, the extent of the indebtedness, the extent to which the debtor has relied on others to keep records, and the extent to which such reliance was reasonable and in accordance with nonbankruptcy law.   *See e.g.*, *In re Cox*, 41 F.3d at 1297.

28

Regarding White's contention as to the debtor's disposition of the $190,000, it does appear that the debtor has produced records showing the use of these funds. The bank statements from the debtor's and Toni's joint account at Greene County Bank where the $190,000 was deposited reveals the checks written on the account. Although $120,000 of the monies was transferred to One Source, the debtor has produced a list of disbursements by One Source after its receipt of the monies.

On the other hand, the debtor has failed to produce any records evidencing the disposition of the tax refund monies received by CPF. In June 2002 after Pinkston obtained the $100,000 line of credit using the cashier's check from Markham as collateral, she transferred sums totaling $65,250 from this line of credit to CPF. The debtor testified in his March 28, 2005 deposition that this was done because CPF had paid some of his debts and this was a way of paying CPF back. Nonetheless, there was no evidence establishing the debts paid by CPF on the debtor's behalf or that CPF was entitled to be repaid these funds. In addition, of the tax refund monies transferred to One Source, some $25,000 was thereafter paid to CPF. Again, there are no records from CPF establishing the use of these funds. In light of the control exercised over CPF by the debtor and the collection efforts being undertaken by the plaintiffs at the time, it was incumbent on the debtor, a sophisticated and educated business man, to produce records evidencing that the transfers to CPF were appropriate. His failure to produce such records is not justified under all of the facts of this case and supports a basis for a denial of discharge.

The final contention by Sherwood with respect to the § 727(a)(3) issue is that during the course of these adversary proceedings the debtor failed to disclose the existence of the second Morgan Stanley account and falsified a summary of the disbursements from the first Morgan Stanley account. The factual basis for this assertion is the debtor's March 28, 2005 deposition where he was asked if he knew that there was a second account and he answered that he knew of no other account. In addition, on or about March 2, 2005, the debtor prepared for Sherwood a summary of activity in the original Morgan Stanley account. Sherwood alleges that this summary was false in that: (1) it referenced the initial deposit as being from the debtor's and Toni's joint return when in fact it was the debtor's income; (2) the summary did not include a November 8, 2002 transfer of 20,000 shares of GMAC stock to the second Morgan Stanley account; and (3) the summary included an April 21, 2003 transfer of $27,000 that in actuality was from the second account.

29

This court is skeptical that such conduct, even if true, falls within the purview of § 727(a)(3), which as noted, covers the concealment, destruction, or falsification of recorded information evidencing the debtor's financial condition or business transactions. A false statement in a deposition and a false summary prepared for litigation purposes are simply not the type of "recorded information" contemplated by § 727(a)(3) and might more appropriately fall within § 727(a)(4), which bars discharge if the debtor knowingly and fraudulently made a false oath or account in connection with a bankruptcy case, a basis for denial of discharge not pled by the plaintiffs. More importantly, however, the court is not convinced that the debtor intentionally lied during his March 28, 2005 deposition regarding the second account or knowingly falsified the summary. The summary prepared by him set forth the transfers from the original account to the second account, listed the second account number, and as noted by Sherwood, even included a transfer from the second account as if it were from the first. These actions are inconsistent with someone hiding the existence of the second account. Furthermore, no evidence contradicted the debtor's trial testimony that the second account was simply a means to permit Morgan Stanley to invest the monies to produce higher yields. Accordingly, Sherwood's contentions in this regard do not establish a basis for denial of discharge under § 727(a)(3).

Denial of Discharge under 11 U.S.C. § 727(a)(5). The last statutory basis for denial of discharge raised by the plaintiffs is § 727(a)(5), which provides that a bankruptcy court may deny the discharge of debts when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). "[O]nce a plaintiff meets the initial burden of producing evidence to prove the facts to establish the objection, the burden of going forward with the evidence that will 'explain satisfactorily' the losses or deficiencies shifts to the debtor." 6 *Collier on Bankruptcy* ¶ 727.08 (citing *Farouki v. Emirates Bank Int'l Ltd.*, 14 F.3d 244 (4th Cir. 1994); *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616 (11th Cir. 1984)).

> Section 727(a)(5) requires that there be a satisfactory explanation of the loss of an asset, but does not require that the explanation be meritorious. W. Norton, 1 *Norton Bankr. L. & Practice* § 27.20 at 27-39 (1982). "Properly construed, the objections should not be sustained based on the substantive character of the explanation." *Id.* The court need only decide whether the explanation satisfactorily

describes what happened to the assets, not whether what happened to the assets was proper.

*Great Am. Ins. Co. v. Nye* (*In re Nye*), 64 B.R. 759, 762 (Bankr. E.D.N.C. 1986).

The plaintiffs contend that the debtor has failed to satisfactorily explain the disposition of the tax refunds.  They note that the tax refunds received by the debtor in 2002 totaled $1,133,421.76, but that by the time the debtor filed for bankruptcy relief less than two years later on March 9, 2004, his assets were reduced to $51,816.79.[10]

Although this is a close question, the court concludes that the plaintiffs have failed to establish a basis for denial of discharge under § 727(a)(5).  The debtor testified that the monies went to pay bank debt and ongoing living expenses and for the most part, this testimony was supported by the documentary evidence in the case.  The debtor had no income from April 2002 forward, yet he and his family continued to live in their multi-million dollar home and farm with their large debts; the debtor continued to maintain and pay the debt service on the million dollar plane; Pinkston continued to receive payment in excess of $5,000 per month to manage the debtor's companies even though they had no income other than monies "invested" in them from the tax refunds or inter-company transfers for management services; the debtor's mother continued to receive her monthly sum from AMP and large monthly sums were expended for the entire family's insurance.  The farm had at least two mortgages on it, to National Bank of Tennessee and Greene County Bank, and the debt service was thousands of dollars a month.  Furthermore, it appeared that the debtor was still trying to put

---

[10] Although not specifically raised in its complaint, Sherwood also argues that the debtor has failed to account for the $250,000 note payable from Pinkston.  However, the evidence clearly set forth what Pinkston did with the $202,845.05 refunded to her by Markham and the court is confident from the evidence that the disbursements made by her with these monies were at the debtor's direction and on his behalf.  On the other hand, there was no evidence establishing that Pinkston ever repaid the debtor the balance of the $250,000, i.e., $47,154.95 ($250,000 - $202,845.05), other than the debtor's unsubstantiated testimony that the balance had been repaid by Pinkston paying other debts on the debtor's behalf.  The lack of evidence supporting the debtor's testimony suggests to the court that the debtor merely forgave Pinkston's repayment of the balance, or that the initial transfer to her was not a real loan and that he rather than Pinkston was actual purchaser such that any loss occasioned by the dispute with Markham should be borne by him instead of  Pinkston.  Because the failure to account for the $250,000 loan was not raised in Sherwood's complaint, it is not necessary for the court to determine whether discharge should be denied on this basis.

deals together in order to rejuvenate his businesses.

Based on all of the forgoing, the court concludes that the debtor has satisfactorily explained the dissipation of the tax refunds. In so concluding, the court does not suggest that the debtor's explanation was proper or meritorious; the evidence clearly established that the debtor tried to hold on to the monies as long as possible and that in order to keep them from being attached by Sherwood or White, he placed the monies first in Toni's name and then made various transfers to and between corporations controlled by him. The debtor engaged in this nefarious activity because he had no other cash and he needed the money to pay the debts on his home, farm, and plane, assets he wanted to hang on to, and in order to meet monthly living expenses. While this course of conduct does not excuse or otherwise justify the debtor's efforts to hinder the plaintiffs' collections efforts, it does provide a "satisfactory" explanation of the debtor's loss of assets within the context of § 727(a)(5).

Furthermore, this finding is not inconsistent with the court's conclusion that the debtor failed to keep books and records which would establish CPF's use of the tax refund monies transferred to it. The debtor testified that all of the monies were used to pay personal and family debts, and while there is no evidence documenting such use by CPF, all other documentary evidence does confirm that substantial sums were utilized to pay the bank debt and ongoing living expenses for the debtor and his family. Documentary evidence is not necessary to corroborate a debtor's testimony where the debtor's testimonial explanation bears sufficient credibility. *See First Am. Bank of New York v. Bodenstein* (*In re Bodenstein*), 168 B.R. 23, 34 (Bankr. E.D.N.Y. 1994).[11] As stated by the court in *Bodenstein*, "[a]n interpretation of 11 U.S.C. § 727(a)(5) mandating documentary corroboration in all instances at a peril of losing a discharge would impermissibly strip purpose and meaning from 11 U.S.C. § 727(a)(3), an independent and separate basis for denying a discharge." *Id.* The bottom line is that while the debtor acted improperly in hindering and delaying the plaintiffs' collection efforts, he "satisfactorily" explained his ultimate use and dissipation of the tax refund monies for purposes of § 727(a)(5).

---

[11] There is authority to the contrary. *See, e.g., Scarsdale Nat'l Bank & Trust Co. v. Switzer* (*In re Switzer*), 55 B.R. 991, 998 (Bankr. S.D.N.Y. 1991) (The trustee and creditors "should not be required to take the debtor's word that he no longer has these assets.").

IV.

The only remaining issue in the case is White's request that his judgment debt be found nondischargeable under § 523(a)(2), which provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2).

<u>Dischargeablity of Debt under 11 U.S.C. § 523(a)(2)(B)</u>.   As previously noted, White contends that the debt owed him by the debtor is nondischargeable under paragraph (A) of § 523(a)(2) because the debtor obtained the money by fraud, by falsely representing his marital status and by advising him that he had a commitment for permanent financing when no such commitment had been obtained.   White also asserts that the debt is nondischargeable under paragraph (B) of § 523(a)(2) because the debtor obtained the loan by the use of a false financial statement that omitted the debtor's financial obligations to Toni arising out of their Martial Dissolution Agreement.

In order to prevail under the latter contention, White must establish "that the debt was obtained by the use of a statement (1) in writing; (2) that is materially false; (3) representing the

debtor's or insider's financial condition; (4) on which the creditor . . . reasonably relied; and (5) that the debtor caused to be made or published with the intent to deceive."  4 *Collier on Bankruptcy* ¶ 523.98[2].

There is no dispute as to elements (1) and (3).  The debtor's December 31, 1999 financial statement is obviously a statement in writing representing his financial condition.  The debtor admits that the statement was false in that it failed to list his obligations to Toni arising out of their marital dissolution agreement, which, including the house the debtor was to build for Toni and the sums payable over seven years, totaled $581,000.

The debtor denies, however, that the statement was materially false, that White reasonably relied on the statement in making the loan, or that he made the statement with the intent to deceive.  The debtor asserts that White's own statements indicate that he relied on TAC's 1998 and 1999 profitability figures and TAC's lines of credit rather than the debtor's personal financial condition.  The debtor also denies that he gave the false financial statement to White with the intent to deceive him.  He testified that the statement was not prepared specifically for White, it was simply a statement that had been prepared for other lenders, and at the time, a $581,000 debt would not have affected his ability to repay the White loan because he had a net worth of $11 million.  The debtor admitted that he did not have a good reason explaining his failure to include the obligation, but stated that the omission was not intentional and that he never have any discussions with White about the state of his marriage or the details of his financial statement after he provided it to White.

It has been held that "[t]he concept of "materiality" within the context of § 523(a)(2)(B) includes both objective and subjective components."  *See First Int'l Bank v Kerbaugh* (*In re Kerbaugh*), 162 B.R. 255, 262 (Bankr. D.N.D. 1993).  Objectively, a statement is materially false if it is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit."  *Id.* (quoting *Avco Fin. Servs. v. Frey* (*In re Frey*), 150 B.R. 742, 745 (Bankr. D.N.D. 1992)).  "The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation."  *Id.*  Both of the objective and subjective components of materiality were supplied by White's testimony.  He stated that he had served on the boards of

34

various financial institutions and that divorce is a significant financial event that sends up red flags, especially if there is an effort to conceal the divorce. White also testified that he would not have loaned the money to the debtor if he had known the true state of his marriage.  The court found White's testimony in this regard to be credible, not only from the objective standpoint cited, but also due to the fact that White visited the debtor in his home and met, at his invitation, his "family."  It is quite reasonable that a potential lender might have serious concerns about loaning monies to an individual who held himself out as married and as a family man, but in actuality had secretly divorced with an substantial financial obligation to his "ex" spouse.  As such, the debtor's failure to reveal his divorce and the financial obligation arising therefrom easily satisfies the "materially false" component of § 523(a)(2)(B).

Regarding the question of whether White reasonable relied on the false financial statement, it must be noted that "[w]hether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances." *BancBoston Mortgage Corp. v. Ledford* (*In re Ledford*), 970 F.2d 1556, 1560 (6th Cir. 1992).

> Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id*.  The requirement is not a "rigorous" one, "but rather is directed at creditors acting in bad faith." *Martin v. Bank of Germantown* (*In re Martin*), 761 F.2d 1163, 1166 (6th Cir. 1985).

White has established that he reasonably relied on the debtor's misrepresentation as to his marital status.  While the evidence did confirm that White was impressed by TAC's profit history and its available lines of credit, it was also clear that White had been impressed by and sold on the idea of the debtor himself, a successful business and family man.  Regardless of whether the debtor was financially able to meet his financial obligations under the MDA, the fact remains that disclosing the divorce would have revealed an individual at odds with the man the debtor presented to White and

35

to the community.  As such, there was actual reliance by White.  In addition, reasonable reliance was established.  There was no indication that White acted in bad faith; nor were any "red flags" cited that would have alerted White to the possibility that all was not as represented.  As shown by the fact that Alan Dietel, one of the debtor's primary employees, was unaware of the debtor's divorce, it was unlikely that the debtor's divorce and his financial obligations therefrom could have been ascertained easily by White.  Furthermore, although the debtor and his associates had been talking with White for some time regarding a possible investment by White, this was White's first investment in any of the debtor's businesses.  White was not in the lending business; he made the loan with personal money he had set aside to pay taxes from his sale of his business to his partner the previous fall.

The last element, whether the debtor gave the financial statement to White with the intent to deceive him, is the most difficult one.  White correctly observes that a statement made with the "actual knowledge that it was incorrect or made with reckless indifference and disregard of the actual facts," satisfies this requirement, citing *Hardwick Bank & Trust Co. v. Brown* (*In re Brown*), 32 B.R. 554 (Bankr. E.D. Tenn. 1983).  *See also Bank One, Lexington, N.A. v. Woolum* (*In re Woolum*), 979 F.2d 71, 73 (6th Cir. 1992) (quoting *In re Martin*, 761 F.2d at 1167) ("The standard is that if the debtor either intended to deceive the [creditor] or acted with gross recklessness, full discharge will be denied.")).  White argues that the debtor's concealment of his divorce was clearly intended to deceive him into making the loan to the debtor and that at a minimum, the debtor was recklessly indifferent and disregarded the actual facts.  While this is a close issue, the court concludes that White has failed to establish this component of nondischargeability.  The court is not convinced that the debtor falsely represented his marital status to White in order to deceive White into making the loan to him. To the contrary, from the evidence the court surmises that the reason the debtor did not include his financial obligations arising from his MDA in his financial statement is that he no longer considered himself divorced and liable to Toni for the divorce debts.  By the time the debtor gave the financial statement to White, Toni was pregnant with the couple's third child; they were living together and finishing construction of their large home.  Granted, the debtor's testimony and Toni's deposition testimony confirmed that the parties' divorce was not a sham at the time it was obtained. Nor did the debtor testify that he did not consider himself divorced as that was his stated basis for his conveyance to Toni of the 1998 tax refund.  But, as previously noted, the MDA obligations were

simply a convenient excuse for the debtor's transfer of the funds. The court is unable to conclude that the debtor's conduct was a reckless disregard of the actual facts when the actual facts as demonstrated by the debtor's and Toni's conduct is that the debtor no longer owed the MDA obligations to Toni. Because intent to deceive has not been established, the judgment debt held by White against the debtor is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B).

<u>Dischargeability of Debt under 11 U.S.C. § 523(a)(2)(A)</u>. Turning to the issue of whether the debt should be excepted from discharge under § 523(a)(2)(A) based on the assertion that the debtor misled White into making the loan by falsely representing that permanent financing had been obtained, the court notes that in order to except a debt from discharge under this provision a creditor must prove: "(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 280-281 (6th Cir. 1998) (footnote omitted).

The debtor denies that he made any false representations in order to induce White to make the loan. More specifically, he denies that White made it a requirement of the loan that permanent financing be in place and he denies that he told White permanent financing had been obtained. The debtor admitted at trial that he had been asked in his March 2005 deposition about the status of permanent financing for ART at the time White made the loan and that he had answered that he had a commitment at that time from Web Bank, but stated at trial that he had made a mistake in this earlier testimony and that it was not possible that he had told White that he had a commitment.

The court simply did not find the debtor credible on this issue. The debtor admitted that he characterized the loan as a bridge loan, which suggested an interim measure until funding from a permanent loan could be obtained. As White was making the loan with personal funds needed in a short amount of time to pay his taxes, it does not seem likely that he would have made the loan unless he knew that funds would be immediately forthcoming to repay him. Furthermore, the debtor admitted that the 90-day repayment schedule was chosen because it usually took 90 days to obtain RDA approval. This repayment schedule makes sense only if the parties were acting under the

37

assumption that the bank had already approved the loan.

Other evidence in the case is also consistent with White's testimony that the debtor told him that the bank had approved a loan for permanent financing. The debtor and his associates had been trying for several months to get the ART project moving forward. Alan Dietel testified that after being hired in February 2000 his first responsibility was to obtain funding for ART via industrial revenue bonds. This approach fell through and Roger Gribble was retained to pursue a bank loan while Dietel and others sought an infusion of equity from potential investors. Gribble initially attempted to obtain the RDA loan from Imperial Bank and then switched to Web Bank, which requested a feasibility study by an expert in the field. White had to be recognized by Web Bank as a qualified expert and then White had to complete the study. By this time, ART already had acquired land for the facility and the debtor's employees were anxious to get started on the equipment. The debtor quickly had the loan documents prepared and was ready to move forward. As such, it was entirely credible that the debtor jumped the gun and told White that the bank had approved the loan, as White testified. Because no bank had even conditionally approved the loan, the debtor's statement was false. While the evidence did not conclusively establish that the debtor knowingly made this false statement, it did confirm that the debtor made the statement, at a minimum, with a reckless disregard for the truth, due to his desire to see ART move forward. *See Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 763 (Bankr. E.D. Tenn. 2003) ("'Reckless disregard' is defined as 'conscious indifference to the consequences of an act.' Similarly, 'recklessness involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing." (quoting *Black's Law Dictionary* 1276 (7th ed.1999)). While the debtor may have believed that bank approval would be forthcoming within a few days due to the submission of the feasibility study, his representation that funding was actually in place without confirming this fact was a statement made with gross recklessness.

This evidence also supports the conclusion that the debtor made this representation in order to deceive White. *See Redmond v. Finch (In re Finch)*, 289 B.R. 638, 644 (Bankr. S.D. Ohio 2003) ("[I]ntent to deceive may be inferred where the false impressions or representations are made with a reckless disregard for their accuracy."). "For purposes of § 523(a)(2)(A), a debtor's intent to deceive a creditor occurs when the debtor makes a false representation which the debtor knows or

38

should have known would induce another to advance money, goods or services to the debtor." *Bernard Lumber Co. v. Patrick* (*In re Patrick*), 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001). "[A] party seeking to establish a debtor's fraudulent intent may rely on circumstantial evidence relating to the debtor's state of mind at the time of the alleged fraud." *Id*.

White testified that he told the debtor that he would not make the loan unless a permanent commitment was in place. As previously noted, the court found White credible and his testimony consistent with the evidence. In light of this testimony, the previous delay encountered by the debtor in obtaining funding for ART, the debtor having been told that the feasibility study was the last piece of the puzzle required for bank approval, the speed by which the debtor had the loan documents prepared, and the debtor's desire to quickly move forward with the project, the court can only infer that the debtor, without first checking the facts, told White that bank approval had been obtained in order to convince White to make the loan.

Third, White justifiably relied on the debtor's representation that the bank had approved the loan. Justifiable reliance is a subjective, less demanding requirement than its objective relative, reasonable reliance. *Field v. Mans*, 516 U.S. 59, 77, 116 S .Ct. 437, 447 (1995). "[J]ustifiable reliance merely requires that a creditor act appropriately according to his individual circumstances." *Woodward v. Bethel* (*In re Bethel*), 302 B.R. 205, 209 (Bankr. N.D. Ohio 2003). "Under this standard, a creditor will be found to have justifiably relied on a representation even though he might have ascertained the falsity of the representation had he made an investigation." *In re Copeland*, 291 B.R. 740, 767 (Bankr. E.D. Tenn. 2003). White testified that he relied on the debtor's representation to him that permanent financing had been obtained and that he would not have made the loan but for the representation. This reliance was justifiable; the debtor and White had built up a relationship of trust and mutual respect and White had no reason to question the debtor when he told him that permanent financing had been secured.

Lastly, White's reliance on the debtor's representation was the proximate cause of the loss. "Proximate cause is established where the misrepresentation is a substantial factor in the loss and where the loss may be reasonably expected to result from reliance." *Wings & Rings, Inc. v. Hoover* (*In re Hoover*), 232 B.R. 695, 700 (Bankr. S.D .Ohio 1999) (citing *Smith v. Young* (*In re Young*), 208

B.R. 189, 200 (Bankr. S.D. Cal. 1997)).  Clearly this standard is established by the facts of this case. But for the debtor's misrepresentation that permanent financing had been obtained and White's reliance on that representation, White would not have made the loan.  And, since no permanent financing was place and in fact never obtained, the debtor was not able to fully repay White's $1.5 million loan, the balance of which is the basis for the judgment debt held by White against the debtor. Based on all of the forgoing, the debtor's obligation to White is excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

V.

In light of the foregoing, the court will enter an order contemporaneously with the filing of this memorandum opinion denying the debtor a discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (3) and otherwise declaring that the debtor's judgment debt obligation to White is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

FILED: February 13, 2006

BY THE COURT

/s/ Marcia Phillips Parsons

UNITED STATES BANKRUPTCY JUDGE